## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT MULLINGS, KERWYN KIRTON, DANIEL MAJESKI, and KEVIN KERR, <br><br> Plaintiffs, <br><br> v. <br><br> DIRECTV, LLC, and MASTEC NORTH AMERICA INC., <br><br> Defendants. | **Case No.  14 CV 05743 (PKC)** |
| JEFF WHITLOCK, MALIK ABDUSSABR, KEVIN MAPLE, ERIC SMITH, NORMAN WHITT,  MATTHEW BLOOMFIELD, NATHAN KIRBY, and MOHD RABABAH, <br><br> Plaintiffs, <br><br> v. <br><br> DIRECTV, LLC and MASTEC NORTH AMERICA, INC., <br><br> Defendants. | **Case No.  15-cv-01860-UA** <br><br><br><br><br><br> **CONSOLIDATED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## THIRD AMENDED CONSOLIDATED COMPLAINT

Plaintiffs Robert Mullings, Kerwyn Kirton, Daniel Majeski, Kevin Kerr, Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Norman Whitt, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah, by and through their undersigned counsel, for their individual complaints against DIRECTV LLC ("DIRECTV"); and MasTec North America, Inc. ("Provider Defendant") (collectively with DIRECTV, "Defendants"), hereby state as follows:

## NATURE OF SUIT

1.      DIRECTV—the largest provider of satellite television services in the United States—is responsible for a far reaching "fissured employment"[1] scheme.  In order to expand and service its customer base (topping more than 20 million domestic subscribers), DIRECTV has engaged tens of thousands of technicians—including each of the Plaintiffs in this case—to install and repair its satellite systems. Although DIRECTV requires these technicians to drive a DIRECTV-branded vehicle, wear a DIRECTV uniform, and perform their work according to DIRECTV's exacting policies and procedures, DIRECTV disclaims any legal relationship with these workers, tagging them instead as "independent contractors" or employees of subordinate entities (including the named service provider Defendants). But it is the economic reality of the relationship—not DIRECTV's self-serving labels—that controls whether Plaintiffs meet the definition (among the broadest ever legislated) of an "employee" under the Fair Labor Standards Act ("FLSA").

2.      Plaintiffs' claims squarely challenge this dangerous trend, and are not the first to do so. The U.S. Department of Labor ("DOL") has made a priority of investigating and exposing multi-party business arrangements that shirk compliance with the FLSA. *See* http://wage-hour.net/post/2012/09/25/Fissured-Industry-Enforcement-Efforts-Continue.aspx (last visited Feb. 25, 2015).  The DOL's Misclassification Initiative, launched under Vice President Biden's

---

[1] Fissured employment describes the practice of a large company attempting to shed its role as a direct employer and purporting to disassociate itself from the workers responsible for its products (albeit maintaining tight control over the method, manner, quantity, and quality of production). The practice of outsourcing an employer's responsibilities and obligations to subordinate entities and subcontractors is highly profitable for companies like DIRECTV, but results in stagnation of wages and benefits and causes rampant violations of wage-and-hour laws. *See e.g.*, David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (Harvard Univ. Press, Feb. 3, 2014);  David Weil, *Enforcing Labour Standards in Fissured Workplaces: The US Experience*, 22 Econ. & Lab. Rel. Rev. 2, at 33-54 (July 2011).

Middle Class Task Force, is aggressively combating this pervasive issue in order to restore rights denied to individuals.[2] In September 2011, then-Secretary of Labor Hilda L. Solis announced the signing of a Memorandum of Understanding between the DOL and the Internal Revenue Service (IRS), under which the agencies combine resources and share information to reduce the incidence of misclassification of employees, to help reduce the tax gap, and to improve compliance with federal labor laws. The DOL's Wage and Hour Division is also partnering with individual states, including New York, whose workers are being subjected to this practice.[3]

3.       The individual Plaintiffs joined herein intend to prove in this litigation that they are legally employed by DIRECTV and, where applicable, MasTec, and are entitled to the overtime and minimum wage protections of the FLSA and related state wage-and-hour law.

## JURISDICTION AND VENUE

4.       The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' individual FLSA claims is based on 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. Jurisdiction over Plaintiffs' state law claims is based upon 28 U.S.C. § 1367. And to the extent the parties are diverse, Plaintiffs' claims also satisfy the requirements of 28 U.S.C. § 1332 because each Plaintiff's individual claim, inclusive of attorneys' fees, exceeds $75,000.

---

[2] "The misclassification of employees as something else, such as independent contractors, presents a serious problem, as these employees often are denied access to critical benefits and protections—such as family and medical leave, overtime compensation, minimum wage pay and Unemployment Insurance—to which they are entitled. In addition, misclassification can create economic pressure for law-abiding business owners, who often struggle to compete with those who are skirting the law. Employee misclassification also generates substantial losses for state Unemployment Insurance and workers' compensation funds." *See* http://www.dol.gov/opa/media/press/whd/WHD20120257.htm (last visited Feb. 25, 2015); *see generally*, DOL Misclassification Initiative, available at http://www.dol.gov/whd/workers/misclassification/ (last visited Feb. 25, 2015).
[3] *See, e.g.*, DOL Misclassification Initiative, *available at* http://www.dol.gov/whd/workers/misclassification/#stateDetails (last visited Feb. 25, 2015).

THIRD AMENDED CONSOLIDATED COMPLAINT

5.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and Defendants are each subject to personal jurisdiction in this district.[4]

## PARTIES

6.     Robert Mullings is an individual residing in Rosedale, New York.

7.     Kerwyn Kirton is an individual residing in Brooklyn, New York.

8.     Daniel Majeski is an individual residing in Sloan, New York.

9.     Kevin Kerr is an individual residing in Hempsted, New York.

10.    Malik Abdussabr is an individual residing in Jamaica, New York.

11.    Matthew Bloomfield is an individual residing in Bessemer City, North Carolina.

12.    Nathan Kirby is an individual residing in San Diego, California.

13.    Kevin Maple is an individual residing in Buffalo, New York.

14.    Mohd Rababah is an individual residing in Houston, Texas.

15.    Eric Smith is an individual residing in Niagara Falls, New York.

16.    Jeff Whitlock is an individual residing in Unionville, New York.

17.    Tomas Mosquera is an individual residing in Maspeth, New York.

18.    Norman Whitt is an individual residing in Buffalo, New York.

19.    William Zielinski is an individual residing in Pensacola, Florida.

---

[4] *See also* Judge Collins' Order transferring this action to the Southern District of New York: "[E]ach Defendant does business nationwide and/or in the specific state to which movants seek to transfer venue. Furthermore, having moved for transfer, the Defendants evidently consent to jurisdiction in these venues. As such, the transferee districts would be able to exercise personal jurisdiction over the Defendants. Because all of the cases assert federal claims (under the Fair Labor Standards Act), it is also clear that the transferee courts would have subject matter jurisdiction. Finally, the transferee courts are proper venues because each of the Defendants in each case is subject to personal jurisdiction in those districts, and, alternatively, the events giving rise to the claims occurred in those districts because those districts are where Plaintiffs worked and were allegedly refused pay." *Mullings v. DirecTV*, Case No. 13-8167 ABC (Ex) (Doc. 63, at 4).

THIRD AMENDED CONSOLIDATED COMPLAINT

20.     DIRECTV, Inc. is a Delaware corporation with its principal place of business in El Segundo, California. DIRECTV, Inc. does business as DIRECTV Home Services. In December 2011, DIRECTV, Inc. merged with another DIRECTV entity, DIRECTV Operations, LLC. The resulting entity is known as DIRECTV, LLC, which is a Delaware corporation with its principal place of business in El Segundo, California.

21.     Defendant MasTec North America, Inc. ("MasTec") is a Florida corporation with its principal place of business in Coral Gables, Florida.

22.     All Plaintiffs performed work for DIRECTV and, where applicable, MasTec, in New York.

23.     Defendants do business or have done business in New York.

## COMMON FACTUAL ALLEGATIONS

### Defendants' Fissured Employment Scheme: The Provider Network

24.     At all relevant times, Plaintiffs worked as satellite television installation technicians. Plaintiffs' principal job duties as technicians were to install and repair DIRECTV satellite television service.

25.     DIRECTV controls and manages its nationwide corps of service technicians in two ways: (1) by directly employing service technicians ("W-2 Employees"); and (2) through an employment network of service providers (the "Provider Network") consisting of Home Service Providers ("HSPs"), Secondary Service Providers ("Secondary Providers"), subcontractors, and service technicians.

26.     DIRECTV operates its Provider Network nationwide from its headquarters in El Segundo, California.

27.     Upon information and belief, at all relevant times, DIRECTV was the primary, if not the only, client of the HSPs and Secondary Providers (HSPs and Secondary Providers are

THIRD AMENDED CONSOLIDATED COMPLAINT

collectively referred to herein as "Providers") and was the source of substantially all of each Provider's income.

28.     During the relevant time period, and as alleged in more detail *infra*, many HSPs were subsumed by DIRECTV through a series of mergers and acquisitions.

29.     By design, the Provider Network is organized and operated as a top-down structure: DIRECTV sits atop the Provider Network, controlling the employment network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers, in turn, enter contracts with a patchwork of largely captive entities that DIRECTV generally refers to as subcontractors; and the subcontractors enter contracts with the technicians who install the satellite television equipment. In some instances, the Providers contract directly with the technicians.

30.     MasTec performed operational and administrative functions pursuant to the policies and procedures set forth in its Provider Agreements with DIRECTV. In this role, MasTec worked directly in the interest of DIRECTV and the Defendants' Provider Network by passing along scheduling from DIRECTV and providing supervision of the respective technicians. That is, DIRECTV set forth the qualification "hiring" criteria for the employees and contractors of MasTec. MasTec then implemented and enforced those qualifications. Similarly, DIRECTV set the requirements for how the technicians were to perform their work. In turn, MasTec monitored and enforced compliance with those requirements. Together with DIRECTV, MasTec controlled the work and compensation of the technicians who were employed by MasTec, as described below, under the FLSA and state employment laws.

31.     MasTec maintained, among other documents, a contractor file for each technician working under their control, albeit as misclassified 1099 subcontractors or "independent contractors" (though, these technicians were actually "employees" under the FLSA). The

THIRD AMENDED CONSOLIDATED COMPLAINT

contents of these contractor files were regulated and audited by DIRECTV. These contractor files are analogous to a personnel file.

32.     MasTec had the power to enter into and terminate contracts with the 1099 technicians working under their control. In this way, MasTec had the power to hire and fire those technicians.

33.     MasTec maintained warehouses and other facilities where the 1099 technicians working under their control had to go to pick up certain equipment and receive certain trainings. The equipment belonged to DIRECTV and the trainings were required by DIRECTV.

34.     No matter how employed, whether directly or as part of the Provider Network, each DIRECTV technician must install DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards as required by DIRECTV.

35.     For those technicians who work as part of the Provider Network, DIRECTV's policies, procedures, practices, performance standards, and payment method requirements are described, mandated, and imposed through the Provider Agreements, Secondary Provider Agreements, and Services Provider Agreements.

36.     DIRECTV obligates the Providers, such as MasTec, to ensure that the technicians perform their work as specified by the Provider Agreements, and, accordingly, the Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements.

37.     The Provider Agreements enable DIRECTV to control nearly every facet of the technician's work, down to the "DIRECTV" shirts they are required to wear and the "DIRECTV" ID card they must show customers.

38.     DIRECTV assigns each technician a scope of work described in a work order that DIRECTV itself delivers via a centralized computer software system that DIRECTV controls.

THIRD AMENDED CONSOLIDATED COMPLAINT

HSPs, like MasTec, have authority to reassign work orders and modify the technician's schedules.

39.     Each technician is assigned a unique "Tech ID Number" by DIRECTV, which connects the technicians directly to a HSP; every DIRECTV work order is assigned to a particular technician via their Tech ID Number. The HSPs, including MasTec, operate as a "middle-man" between DIRECTV and the technicians. In addition to DIRECTV, MasTec also exerts direct control over the technicians and are responsible for the technicians fulfilling the DIRECTV work order in its assigned region.

40.     Plaintiffs typically started their workdays after receiving daily work schedules assigned through DIRECTV's dispatching systems. DIRECTV used a database program known as SIEBEL to coordinate the assignment of particular work orders to technicians using each technician's unique Tech ID Number.

41.     DIRECTV mandates particularized methods and standards of installation to assure DIRECTV's equipment is installed according to the dictates of DIRECTV's policies and procedures. As a consequence, each technician's essential job duties are virtually identical no matter where performed and no matter which intermediary the technician is ostensibly working for.

42.     After receiving their daily work schedules, Plaintiffs typically called the customer contact for each of their assigned jobs to confirm the timeframe within which the technician expected to arrive at the customer's home. Plaintiffs then traveled to their first assigned job and thereafter continued to complete the jobs assigned by DIRECTV in the prescribed order on the daily work schedule. Upon arriving at each job site, Plaintiffs were required to check-in by telephone or hand-held with DIRECTV via its dispatching system. At the end of an assigned job,

Plaintiffs were required to report to DIRECTV that the installation was complete and, thereafter, worked directly with DIRECTV employees to activate the customer's service.

43. When performing DIRECTV's work, Plaintiffs were required to purchase and wear a uniform with DIRECTV insignia on it. Additionally, Plaintiffs were required to display DIRECTV insignia on vehicles driven to customers' homes for installations.

44. Although DIRECTV and the HSPs control nearly every aspect of the technicians' work, Defendants insist that the technicians are not their employees, often claiming that they are not employees at all but that they are "independent contractors."

45. Plaintiffs will show that the Provider Network is purposefully designed to exercise the right of control over its technician corps while avoiding the responsibility of complying with the requirements of the FLSA and applicable state employment laws.

**DIRECTV's Workforce Consolidation: Acquisition of Providers by Defendants**

46. DIRECTV's control over its purportedly independent provider partners is integral to its fissured employment scheme. So much so that DIRECTV regularly infuses these partners with what it labels internally as "extraordinary advance payments" in order to keep their dependent operations afloat while preserving an outward appearance of independence. When litigation or other circumstances make the "independent" relationship a negative for DIRECTV, DIRECTV simply absorbs these entities by acquisition.

47. The absorption by DIRECTV is seamless, simply a resetting of titles without the functional modifications that normally accompany an arm's length acquisition. To date, there are only three "independent" HSPs still in operation—including MasTec. Since DIRECTV developed its HSP Network, DIRECTV or one of these three remaining HSPs has purchased at

least thirteen prior HSPs.[5] Below is a description of the prior HSPs for which the Plaintiffs technicians worked and how those HSPs were ultimately acquired by DIRECTV or MasTec.

**Halsted Communications, Ltd.**

48.     MasTec North America, Inc. acquired Halsted Communications, Ltd., ("Halsted") including all of its facilities in June 2011. After the acquisition, MasTec conducted business out of Halsted's locations, and personnel from Halsted worked for MasTec. Many of Halsted's employees were hired by MasTec.

49.     Upon information and belief, working conditions for installation technicians who worked for Halsted remained substantially the same after MasTec acquired Halsted. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after MasTec acquired Halsted. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

### The Economic Reality: DIRECTV and its Provider Network Employ the Technicians

50.     DIRECTV exerts significant control over the Providers and Plaintiffs regarding the essential terms and conditions of Plaintiffs' employment.

51.     DIRECTV and MasTec are, and were at all times relevant herein, in the business of, among other things, providing satellite television service to businesses and consumers. Installation and repair of satellite dishes, receivers, and related equipment is an integral part of DIRECTV's business.

52.     An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an employee may be employed

---

[5] These include AeroSat, Bruister, Bluegrass Satellite and Security, ConnecTV, Directech NE, Directech SW, DTV Home Services II, LLC, Halsted Communications, Ironwood Communications, JP&D Digital Satellite, Michigan Microtech, Mountain Satellite and Security, and Skylink.

THIRD AMENDED CONSOLIDATED COMPLAINT

by more than one employer at the same time. Employment status for purposes of wage and hour law is informed by the real economic relationship between the employer(s) and the employees. Here, through its Provider Network, DIRECTV establishes, defines, and controls the economic relationship between DIRECTV and its technicians. Among other indicia of employment described herein, DIRECTV and the Providers control the details of Plaintiffs' day-to-day work and the piece rate compensation method by which technicians are paid for their work.

53.     Through the Providers, DIRECTV exercises significant control over Plaintiffs' daily work lives, including, but not limited to, control over what work Plaintiffs performed, where that work was performed, when that work was performed, and how that work was performed.

54.     Through the Providers, DIRECTV also determines whether Plaintiffs' work merited compensation, including setting the rate of pay to the Providers for the Plaintiffs' work. Among other controls, DIRECTV defined Plaintiffs' compensable and non-compensable work and imposed "rollbacks" and "chargebacks," thereby setting Plaintiffs' rate of pay on a piece-rate basis tailored to achieve its business purposes. Through the Provider Network, DIRECTV utilized its Providers' payroll and paycheck systems to administer its piece-rate compensation scheme, including issuing paychecks to Plaintiffs.

55.     DIRECTV required Plaintiffs to hold themselves out as agents of DIRECTV.

56.     DIRECTV promulgates detailed instructions for how installations are to be completed. Plaintiffs received these instructions and performed the work as DIRECTV required. By requiring that Plaintiffs comply with DIRECTV's instructions, Defendants deliberately prevented Plaintiffs from exercising meaningful discretion in how they performed installations.

57.     DIRECTV publishes training materials that technicians such as Plaintiffs are required to review.

58.     DIRECTV requires that all technicians pass pre-screening and background checks, and obtain a certification from the Satellite Broadcasting & Communications Association ("SBCA") before that technician may be assigned DIRECTV work orders. This requirement allows DIRECTV to mandate certain training for all technicians.

59.     DIRECTV uses these requirements to control who is hired to install its systems.

60.     DIRECTV and the Providers utilize a network of quality control personnel and field managers to oversee the work performed by Plaintiffs.

61.     DIRECTV and Providers' quality control personnel reviewed Plaintiffs' work, and Plaintiffs were subject to chargebacks and/or rollbacks based on those reviews.

62.     As described in detail above, DIRECTV, through its SIEBEL system, assigns detailed work schedules to Plaintiffs. Through this system, DIRECTV and the Providers effectively control who continues to perform their work, and can effectively terminate any technician by simply ceasing to issue work orders to that technician.

63.     Upon information and belief, DIRECTV and Providers required technicians who were classified as 1099 independent contractors to sign "Subcontractor Agreements."

64.     Defendants are each engaged in interstate commerce and, upon information and belief, Defendants each gross more than Five Hundred Thousand Dollars in revenue per year.

65.     Defendants' policies and practices accomplish two, interrelated purposes: they ensure DIRECTV controls its technicians' work, while deliberately disclaiming their status as employees under state and federal employment laws.

66.     By imposing their policies and practices—and to mask the economic realities of its employment relationship with Plaintiffs—Defendants willfully fail to maintain time records and other employment documentation, thereby saving payroll and other costs. And by imposing

their policies and practices to avoid the reach of state and federal employment laws, Defendants willfully fail to pay minimum wage and overtime compensation to Plaintiffs.

67.    Through the Provider Network, Defendants imposed their policies and practices uniformly, which created an economic reality driven by their control over Plaintiffs and their work, sufficient to establish that DIRECTV, and, where applicable, MasTec, are Plaintiffs' employers, jointly and severally, and subject to liability under the FLSA and applicable state employment laws.

**The Piece-Rate System: Defendants' Unlawful Payment Scheme**

68.    As with other aspects of Plaintiffs' work, DIRECTV effectively controlled Plaintiffs' pay through the common policies and practices mandated in its Provider Agreements.

69.    Every Plaintiff was paid pursuant to the piece-rate payment scheme that is utilized throughout DIRECTV's Provider Network.

70.    The FLSA permits employers to pay on a piece-rate basis as long as the employer pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty in a week, based on the employee's regular rate. See 29 U.S.C. § 207(a)(g); 29 C.F.R. 778.318(a).

71.    The employer and employee may agree that the piece-rate pay includes pay for productive and nonproductive hours, but where there is no agreement, the FLSA is not satisfied. See 29 U.S.C. § 207(g) (employer's method for calculating the overtime premium must be made "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work."); 29 C.F.R. 778.318(c) (where it is "understood by the parties that other compensation received by the employee is intended to cover pay for such hours" . . . . "[I]f that is the agreement of the parties, the regular rate of the piece worker will be the rate

13

determined by dividing the total piece work earnings by the total hours worked (productive and nonproductive) in the workweek.")

72.     There was no contract, memorandum, or other document between Plaintiffs and DIRECTV or the Provider Defendant properly memorializing or explaining this pay system.

73.     Under this system, Plaintiffs were not paid for all hours they worked for Defendants. Rather, they were paid on a per-task (a/k/a piece rate) basis for satisfactorily completing a DIRECTV-approved satellite installation.

74.     The piece-rate system only pays technicians for certain enumerated "productive" tasks—tasks that DIRECTV and the Providers listed on standardized rate cards—but fails to compensate technicians for all necessary work they perform.

75.     In addition to the certain tasks DIRECTV designated as compensable, Plaintiffs performed other work each week during the relevant time period for Defendants, such as assembling satellite dishes, driving to and between job assignments, reviewing and receiving schedules, calling customers to confirm installations, obtaining required supplies, assisting other technicians with installations, performing required customer educations, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on "rollback" installations where Plaintiffs had to return and perform additional work on installations previously completed.

76.     Plaintiffs were not paid for these integral and indispensable tasks that were necessary to their principal activity of installing and repairing DIRECTV satellite television service.

77.     Although Plaintiffs worked more than forty hours per week, as set forth in more detail below, they were not compensated for these "nonproductive" tasks. Accordingly, to the extent W-2 technician Plaintiffs' pay was translated to a "regular rate" (as required by the FLSA

for calculating overtime due to piece-workers), Plaintiffs' regular rate did not reflect compensation for all hours worked and they were not properly compensated for overtime hours.

78.     Defendants did not pay Plaintiffs' wages free and clear. Rather, many Plaintiffs were subjected to "chargebacks" wherein Defendants would deduct amounts from Plaintiffs' pay if there were issues with an installation, or questions from the customer, generally up to 90 days after the customer's service was activated. The chargeback would occur for a variety of reasons, many of which were out of Plaintiffs' control, including, for example, faulty equipment, improper installation, customer calls regarding how to operate their remote control, or a customer's failure to give greater than a 95% satisfaction rating for the services provided by the technician.

79.     In addition to chargebacks, independent contractor Plaintiffs were also required to purchase supplies necessary to perform installations, such as screws, poles, concrete, and cables; and independent contractor Plaintiffs were also required to provide all maintenance and purchase all the gas used in the vehicle they drove between DIRECTV customers' homes. Nor were these independent contractors paid an overtime premium for work done beyond 40 hours in a workweek.

80.     These required business expenses were incurred for Defendants' financial benefit and reduced the wages of these technicians. Plaintiffs, in virtually every workweek, worked more than 40 hours per week for Defendants, as alleged in more detail below.

81.     Plaintiffs were not paid the overtime premium required by applicable law for work done beyond 40 hours in a given workweek.

82.     The policy and practice of imposing "chargebacks," failing to compensate Plaintiffs for all hours worked, and failing to reimburse Plaintiffs' necessary business expenses resulted in Plaintiffs routinely working more than forty hours in a work week while being denied

overtime pay and being subjected to an effective wage rate below that required by applicable law.

83.     Plaintiffs intend to prove that Defendants' piece-rate pay system fails to comply with applicable law, and constitutes an effort to deliberately deny Plaintiffs earned wages and overtime compensation in violation of the FLSA and state law.

## LITIGATION HISTORY

### *Lang v. DIRECTV*

84.     Plaintiffs Robert Mullings, Kerwyn Kirton, and Daniel Majeski, previously opted in to a conditionally certified FLSA action pending in the Eastern District of Louisiana styled *Lang v. DIRECTV, et al*., No. 10-1085-NJB. The *Lang* case was pending as a collective action until the court, on September 3, 2013, granted the parties' joint motion decertifying the class, dismissed the opt-in plaintiffs' claims without prejudice to pursue the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 60 days from the date of the order. *Lang v. DIRECTV*, Case No. 10-1085-NJB (E.D. La.) (Docs. 466, 466-1).

### *Mullings v. DIRECTV*

85.     Within the 60 days granted by the *Lang* court, Plaintiffs Robert Mullings, Kerwyn Kirton, and Daniel Majeski subsequently filed this action in the Central District of California on November 1, 2013. *Mullings v. DirecTV*, Case No. CV 13-8167-ABC (Ex) (Doc. 1). Plaintiffs, including Kevin Kerr, filed a First Amended Complaint on December 23, 2013. (*Id*., at doc. 10). On July 22, 2014, the court entered an order granting Defendants' Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) and denying as moot and without prejudice Defendants' Motion to Sever Claims of Plaintiffs and Motion to Sever Defendants, finding, pursuant to the parties' stipulation,

THIRD AMENDED CONSOLIDATED COMPLAINT

that the Southern District of New York was the appropriate District for this action. (*Id.* at doc. 63).

### Arnold v. DIRECTV

86.     Plaintiffs Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah previously filed consents to become party plaintiffs in *Arnold v. DIRECTV*, No. 10-0352-JAR, a collective action pending in the Eastern District of Missouri. Pursuant to a Proposed Case Management Plan Order (Docs. 216, 220), the court dismissed the claims of certain opt-in plaintiffs who did not fit into a subclass, (*see* Doc. 220), including Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah, without prejudice to pursue the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 90 days from the date of the order. (Doc. 221, Notice of Voluntary Decertification; Doc. 244, Order).

87.     Within the 90 days granted by the *Arnold* court, Plaintiffs Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah joined their individual claims in this action, along with those of Norman Whitt.

## PLAINTIFFS' CLAIMS

### Robert Mullings

88.     Plaintiff Robert Mullings is an individual residing in the state of New York. For a period of time, between approximately 2006 and 2011 Robert Mullings was treated as a W-2 technician of Halsted Communications, for another period of time, between approximately 2011 and April 2013, he was treated as an independent contractor of JTTM Communications Corp. For all of his time working as a technician, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

THIRD AMENDED CONSOLIDATED COMPLAINT

89.     In virtually every workweek between approximately 2006 and May 2013, Robert Mullings worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[6]

90.     In fact, Robert Mullings spent in excess of 60 hours per week performing tasks for the benefit of Defendants. Of those 60+ hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

91.     Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $150 and $200 per week, failing to compensate Robert Mullings for all hours worked, and failing to reimburse Robert Mullings' necessary business expenses averaging $938 per month) resulted in further unlawful reduction of Robert Mullings' compensation.

92.     Robert Mullings does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Robert Mullings estimates that, in a given workweek, he would work 60 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $175 per week; and would be paid $450 per week, which would be reduced by unreimbursed business expenses of $235 per week.

93.     Robert Mullings brings claims against DIRECTV and MasTec.

**Kerwyn Kirton**

94.     Plaintiff Kerwyn Kirton is an individual residing in the state of New York. Although Kerwyn Kirton was treated as an independent contractor of DP Satellite, Ameritek Telecommunications, Inc., National Sat., and NP Communications and Networking, Inc., under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[6] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

95.     In virtually every workweek between approximately March 2010 and October 2013, Kerwyn Kirton worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[7]

96.     In fact, Kerwyn Kirton spent approximately 40 to 80 hours per week performing tasks for the benefit of Defendants. Of those 40 to 80 hours, 15 to 40 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

97.     Defendants' employment policies and practices detailed herein (*i.e.*, imposing multiple "chargebacks" in varying amounts but often ranging between $90 and $140 per week, failing to compensate Kerwyn Kirton for all hours worked, and failing to reimburse Kerwyn Kirton's necessary business expenses averaging $990 to $1160 per month) resulted in unlawful reduction of Kerwyn Kirton's compensation.

98.     Kerwyn Kirton does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Kirwyn Kirton estimates that, in a given workweek, he would work 60 hours, 28 hours of which were unpaid; he would be subject to chargebacks of $115; and would be paid $700 per week, which would be reduced by unreimbursed business expenses of $269 per week.

99.     Kerwyn Kirton brings claims against DIRECTV and MasTec.

**Daniel Majeski**

100.     Plaintiff Daniel Majeski is an individual residing in the state of New York. Although Daniel Majeski was treated as an independent contractor of Dan's Heating and Cooling, Inc., under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[7] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

THIRD AMENDED CONSOLIDATED COMPLAINT

101.   In virtually every workweek between approximately April 2009 and January 2011, Daniel Majeski worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[8]

102.   In fact, Daniel Majeski spent approximately 60 to 80 hours per week performing tasks for the benefit of Defendants. Of those 60 to 80 hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

103.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $140 and $350 per week, failing to compensate Daniel Majeski for all hours worked, and failing to reimburse Daniel Majeski's necessary business expenses averaging $2316 to $2950 per month) resulted in further unlawful reduction of Daniel Majeski's compensation.

104.   Daniel Majeski does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Daniel Majeski estimates that, in a given workweek, he would work 70 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $245; and would be paid $800 per week, which would be reduced by unreimbursed business expenses of $658 per week.

105.   Daniel Majeski brings claims against DirecTV and MasTec.

**Kevin Kerr**

106.   Plaintiff Kevin Kerr is an individual residing in the state of New York. Although Kevin Kerr was treated as an independent contractor of RHI Installations Corp., under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[8] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

107.    In virtually every workweek between approximately November 2007 and August 2011, Kevin Kerr worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[9]

108.    In fact, Kevin Kerr spent approximately 50 to 60 hours per week performing tasks for the benefit of Defendants. Of those 50 to 60 hours, 20 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

109.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $100 per week, failing to compensate Kevin Kerr for all hours worked, and failing to reimburse Kevin Kerr's necessary business expenses averaging $1496 per month) resulted in further unlawful reduction of Kevin Kerr's compensation.

110.    Kevin Kerr does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Kevin Kerr estimates that, in a given workweek, he would work 55 hours, 20 hours of which were unpaid; he would be subject to chargebacks of $100; and would be paid $380 per week, which would be reduced by unreimbursed business expenses of $374 per week.

111.    Plaintiff Kevin Kerr brings claims against DIRECTV and MasTec.

**Jeff Whitlock**

112.    Plaintiff Jeff Whitlock is an individual residing in the state of New York. Although Jeff Whitlock was treated as a W-2 technician of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[9] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

THIRD AMENDED CONSOLIDATED COMPLAINT

113.    In virtually every workweek between approximately March 2009 and February 2010, Jeff Whitlock worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[10]

114.    In fact, Jeff Whitlock spent approximately 80 to 85 hours per week performing tasks for the benefit of Defendants. Of those 80 to 85 hours, 20 to 25 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

115.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing over one hundred "chargebacks" in varying amounts but averaging $20 to $40 per week and failing to compensate Jeff Whitlock for all hours worked) resulted in further unlawful reduction of Jeff Whitlock's compensation.

116.    Jeff Whitlock does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Jeff Whitlock estimates that, in a given workweek, he would work 83 hours, 23 hours of which were unpaid; he would be subject to chargebacks of $30 per week; and he would be paid $500 per week.

117.    Jeff Whitlock brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

**Malik Abdussabr**

118.    Plaintiff Malik Abdussabr is an individual residing in the state of New York. Although Malik Abdussabr was treated as a W-2 technician of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[10] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

THIRD AMENDED CONSOLIDATED COMPLAINT

119.    In virtually every workweek between approximately October 2004 and February 2011, Malik Abdussabr worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[11]

120.    In fact, Malik Abdussabr spent approximately 65 to 70 hours per week performing tasks for the benefit of Defendants. Of those 65 to 70 hours, 25 to 30 were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

121.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing over one hundred "chargebacks" in amounts varying amounts but averaging $20 to $80 per week and failing to compensate Malik Abdussabr for all hours worked) resulted in further unlawful reduction of Malik Abdussabr's compensation.

122.    Malik Abdussabr does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Malik Abdussabr estimates that, in a given workweek, he would work 68 hours, 28 hours of which were unpaid; he would be subject to chargebacks of $60 per week; and he would be paid $850 per week.[12]

123.    Malik Abdussabr brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

**Kevin Maple**

124.    Plaintiff Kevin Maple is an individual residing in the state of New York. Although Kevin Maple was treated as a W-2 technician of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[11] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[12] Although the provided example workweek does not fall below the minimum wage, Defendants possess the documents needed to prove that *no* workweeks fell below the minimum wage.

125.     In virtually every workweek between approximately May 2005 and October 2010, Kevin Maple worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec, primarily in the state of New York, and was unlawfully deprived of overtime compensation.[13]

126.     In fact, Kevin Maple spent approximately 70 hours per week performing tasks for the benefit of Defendants. Of those 70 hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

127.     Defendants' employment policies and practices detailed herein (*i.e.*, imposing a total of six "chargebacks" of $20 each and failing to compensate Kevin Maple for all hours worked) resulted in further unlawful reduction of Kevin Maple's compensation.

128.     Kevin Maple does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Kevin Maple estimates that, in a given workweek, he would work 70 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $20; and would be paid $475 per week.

129.     Kevin Maple brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

**Eric Smith**

130.     Plaintiff Eric Smith is an individual residing in the state of New York. Although Eric Smith was treated as a W-2 technician of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

131.     In virtually every workweek between approximately July 2005 and February 2012, Eric Smith worked more than 40 hours per week as a technician for DIRECTV, Halsted,

---

[13] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

THIRD AMENDED CONSOLIDATED COMPLAINT

and MasTec, primarily in the state of New York and also in Pennsylvania, and was unlawfully deprived of overtime compensation.[14]

132.   In fact, Eric Smith spent approximately 45 hours per week performing tasks for the benefit of Defendants. Of those 45 hours, 15 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

133.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing several "chargebacks" in varying amounts but averaging $40 to $100 per week and failing to compensate Eric Smith for all hours worked) resulted in further unlawful reduction of Eric Smith's compensation.

134.   Eric Smith does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Eric Smith estimates that, in a given workweek, he would work 45 hours, 15 hours of which were unpaid; he would be subject to chargebacks of $70 per week; and he would be paid $500 per week.[15]

135.    Eric Smith brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

**Norman Whitt**

136.   Plaintiff Norman Whitt is an individual residing in the state of New York. Although Norman Whitt was treated as a W-2 technician of Halsted and then MasTec, under the FLSA and New York law he was employed by both DIRECTV and MasTec.

---

[14] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[15] Although the provided example workweek does not fall below the minimum wage, Defendants possess the documents needed to prove that *no* workweeks fell below the minimum wage.

THIRD AMENDED CONSOLIDATED COMPLAINT

137.    In virtually every workweek between approximately 2003 and the present, Norman Whitt worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state New York, and was unlawfully deprived of overtime compensation.[16]

138.    In fact, Norman Whitt spent approximately 60 hours per week performing tasks for the benefit of Defendants. Of those 60 hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

139.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $25 per week and failing to compensate Norman Whitt for all hours worked) resulted in further unlawful reduction of Norman Whitt's compensation.

140.    Norman Whitt does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Norman Whitt estimates that, in a given workweek, he would work 60 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $25 per week; and he would be paid $700 per week.[17]

141.    Norman Whitt brings FLSA and state law claims against DIRECTV and MasTec.

**Matthew Bloomfield**

142.    Plaintiff Matthew Bloomfield is an individual residing in the state of North Carolina. Although Matthew Bloomfield was treated as a W-2 technician of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

143.    In virtually every workweek between approximately August 2010 and December 2010, Matthew Bloomfield worked more than 40 hours per week as a technician for DIRECTV,

---

[16] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[17] Although the provided example workweek does not fall below the minimum wage, Defendants possess the documents needed to prove that no workweeks fell below the minimum wage.

Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[18]

144.    In fact, Matthew Bloomfield spent approximately 84 hours per week performing tasks for the benefit of Defendants. Of those 84 hours, 54 were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

145.    Defendants' employment policies and practices detailed herein, failing to compensate Matthew Bloomfield for all hours worked, resulted in further unlawful reduction of Matthew Bloomfield's compensation.

146.    Matthew Bloomfield does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Matthew Bloomfield estimates that, in a given workweek, he would work 84 hours, 54 hours of which were unpaid and he would be paid $360 per week.

147.    Matthew Bloomfield brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

**Nathan Kirby**

148.    Plaintiff Nathan Kirby is an individual residing in the state of California. Although Nathan Kirby was treated as an independent contractor of Direct Link and New England Satellite & Sound, Inc., under the FLSA and New York law, he was employed by DIRECTV and MasTec.

149.    In virtually every workweek between approximately July 2010 and March 2013, Nathan Kirby worked more than 40 hours per week as a technician for DIRECTV, Halsted, and

---

[18] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

MasTec, primarily in the state of New York, and was unlawfully deprived of overtime compensation.[19]

150.    In fact, Nathan Kirby spent approximately 50 to 65 hours per week performing tasks for the benefit of Defendants. Of those 50 to 65 hours, 25 to 35 were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

151.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but averaging $150 per week, failing to compensate Nathan Kirby for all hours worked, and failing to reimburse Nathan Kirby's necessary business expenses averaging $628 to $1078 per month) resulted in further unlawful reduction of Nathan Kirby's compensation.

152.    Nathan Kirby does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Nathan Kirby estimates that, in a given workweek, he would work 58 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $150 per week; and would be paid $435 per week, which would be reduced by unreimbursed business expenses of $213 per week.

153.    Nathan Kirby brings FLSA and state law claims against DIRECTV and MasTec.

**Mohd Rababah**

154.    Plaintiff Mohd Rababah is an individual residing in the state of Texas. Although Mohd Rababah was treated as an independent contractor of Halsted, under the FLSA and New York law, he was employed by DIRECTV and MasTec.

---

[19] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Nathan Kirby has gaps in his DIRECTV employment from approximately August 2010 to November 2012.

155.     In virtually every workweek between approximately March 2011 and July 2011, Mohd Rababah worked more than 40 hours per week as a technician for DIRECTV, Halsted, and MasTec in the state of New York, and was unlawfully deprived of overtime compensation.[20]

156.     In fact, Mohd Rababah spent approximately 70 hours per week performing tasks for the benefit of Defendants. Of those 70 hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

157.     Defendants' employment policies and practices detailed herein, failing to compensate Mohd Rababah for all hours worked, resulted in further unlawful reduction of Mohd Rababah's compensation.

158.     Mohd Rababah does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Mohd Rababah estimates that, in a given workweek, he would work 70 hours, 30 hours of which were unpaid and he would be paid $350 per week.

159.     Mohd Rababah brings FLSA and state law claims against DIRECTV, and state law claims against MasTec.

## COUNT I

### Violation of the Fair Labor Standards Act of 1938

*By each Plaintiff individually against Defendant(s)*

160.     Plaintiffs re-allege all allegations set forth above.

161.     At all times material herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

---

[20] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

162.    The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

163.    The FLSA also regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a).

164.    Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce.

165.    Defendants violated the FLSA by failing to pay all minimum wage and overtime wages due to Plaintiffs, failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay.

166.    As to defendant DIRECTV, Plaintiffs are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing their consent to join forms in the *Lang* or *Arnold* litigation,[21] plus periods of equitable tolling,[22]

---

[21] Or from the date of filing the First Amended *Mullings* Complaint in this case for Plaintiff Kevin Kerr, *i.e.*, December 23, 2013; or from the date of filing the Original *Whitlock* Complaint for new Plaintiff Norman Whitt, *i.e.*, March 12, 2015.

[22] Former *Arnold* Plaintiffs Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah are entitled to an additional five months of tolling on their claims against DIRECTV per the law of the case. The *Arnold* court ordered a period of tolling on the running of the opt-ins' limitations period during a discovery stay while DIRECTV's motion to dismiss was pending. (*Arnold* Docs. 46, 49). The period of tolling was

because DIRECTV acted willfully and knew or showed reckless disregard in their violation of the FLSA.

167.    Plaintiffs with claims against MasTec are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing (1) their original complaint in the Mullings action, *i.e.*, November 1, 2013,[23] (2) the date of filing the First Amended *Mullings* Complaint, *i.e.*, December 23, 2013[24] or (3) the date of filing the original *Whitlock* Complaint, *i.e.*, March 12, 2015,[25] plus periods of equitable tolling, because MasTec acted willfully and knew or showed reckless disregard in its violation of the FLSA.

168.    Pursuant to Defendants' policies and practices, Defendants willfully violated the FLSA by refusing and failing to pay Plaintiffs overtime and minimum wages. In the course of perpetrating these unlawful practices, Defendants willfully failed to keep accurate records of all hours worked by, compensation paid to, and expenses incurred by Plaintiffs.

169.    Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA. As a result thereof, Plaintiffs are each entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith in failing to pay Plaintiffs minimum wage and overtime compensation, Plaintiffs are each entitled to an award of prejudgment interest at the applicable legal rate.

---

150 days, which, added to the applicable three year period gives former *Arnold* Plaintiffs' claims against DIRECTV a three year, five month lookback from the date each opt-in joined that action.

[23] Plaintiffs Robert Mullings, Kerwyn Kirton, and Daniel Majeski.

[24] Plaintiff Kevin Kerr.

[25] Plaintiff Norman Whitt.

THIRD AMENDED CONSOLIDATED COMPLAINT

170.    Defendants' unlawful conduct was willful because, among other reasons described herein, DIRECTV, MasTec, and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits. Those systems have been challenged in numerous lawsuits around the country in which DIRECTV, as well as other HSP members of DIRECTV's provider network, have all been defendants. Indeed DIRECTV is currently a defendant in a lawsuit brought the U.S. department of labor in the United States district court for the western district of Washington challenging DIRECTV's (1) status as an employer of technicians like the plaintiffs herein and (2) the piece-rate compensation system. The system being challenged in that case is essentially identical to the system(s) being challenged in this case.

171.    As a result of these violations of the FLSA's minimum wage and overtime pay provisions, compensation has been unlawfully withheld from Plaintiffs by Defendants. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages and overtime premium pay along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

172.    Plaintiffs request relief as described below and as permitted by law.

## COUNT II

### Violation of New York Minimum Wage and Overtime Law

(N.Y. Lab. Law Ch. 31, Art. 6, 19)

*By each Plaintiff individually against Defendants*

173.    Plaintiffs re-allege the allegations set forth above.

174.    Defendants violated New York law, in relevant part, by failing to pay overtime premium pay to Plaintiffs as required by 12 N.Y.C.R.R. 142-2.2.

THIRD AMENDED CONSOLIDATED COMPLAINT

175.   Defendants violated New York law, in relevant part, by willfully failing to compensate Plaintiffs for all wages earned and all hours worked at least at the minimum wage fixed by the commission in violation of New York Labor Law § 652 and 12 N.Y.C.R.R. 142-2.1.

176.   Further, Plaintiffs are entitled to recover minimum and overtime wages plus an additional amount as liquidated damages equal to one hundred percent of the total of such wages found to be due, interest, attorneys' fees, and costs pursuant to § 663, in amounts to be proved at trial.

177.   As alleged herein, Plaintiffs were paid piece-rate for very limited and specific tasks that they completed for Defendants. They were not compensated for other tasks completed for Defendants' benefit. Moreover, Plaintiffs were not compensated for all time worked during the continuous workday.

178.   Plaintiffs have been damaged by Defendants' willful failure to compensate them as required by law.

179.   Plaintiffs are entitled to recover overtime and unpaid wages for the six years preceding the first filing of their claims against Defendants, N.Y. Lab. Law § 198,[26] plus an additional amount as liquidated damages equal to one hundred percent of the total of such wages found to be due, interest, attorneys' fees, and costs pursuant to N.Y. Lab. Law § 663, in amounts to be proved.

180.   Plaintiffs request relief as described below and as permitted by law.

---

[26] Plaintiffs Robert Mullings, Kerwyn Kirton, and Daniel Majeski, *i.e.*, November 1, 2013; for Plaintiff Kevin Kerr, *i.e.*, December 23, 2013; and for Plaintiffs Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Norman Whitt, Matthew Bloomfield, Nathan Kirby, and Mohd Rababah, *i.e.*, March 12, 2015.

THIRD AMENDED CONSOLIDATED COMPLAINT

## COUNT III

### Failure to Provide Required Notice

(N.Y. Lab. Law § 195 (McKinney))

*By each Plaintiff individually against Defendants*

181.    Plaintiffs re-allege the allegations set forth above.

182.    Under New York Labor Law § 195, Defendants are required to provide in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, and on or before February first of each subsequent year of the employee's employment with the employer, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and the telephone number of the employer and obtain written acknowledgment by the employee of receipt.  For all employees who are not exempt from overtime compensation, the notice must state the regular hourly rate and overtime rate of pay; itemized statements when they pay wages showing gross wages earned, total hours worked, number of piece rate units earned, deductions, net wages, inclusive dates of pay period, and other information.

183.    Defendants violated their obligations under New York law, including those under § 195 by failing to provide Plaintiffs with such notice.

184.    Defendants are liable for statutory penalties, injunctive and declaratory relief, costs and attorneys' fees pursuant to New York Labor Law § 198.

185.    Plaintiffs request relief as described below and as permitted by law.

THIRD AMENDED CONSOLIDATED COMPLAINT

## COUNT IV

### Failure to Furnish Wage Statements

(New York Labor Law § 195)

*By each Plaintiff individually against Defendants*

186.    Plaintiffs re-allege the allegations set forth above.

187.    Under New York Labor Law § 195, Defendants are required to provide itemized statements when they pay wages showing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages; and the applicable piece rate or rates of pay and number of pieces completed at each piece rate.

188.    Defendants violated their obligations under New York law, including those under § 195, by failing to provide Plaintiffs with timely and accurate wage statements.

189.    As a direct and proximate result, Plaintiffs have suffered damages. Among other things, Defendants' failure led plaintiffs to believe that they were being paid for all hours and jobs actually worked; Defendants' wage statement failures prevented and will prevent Plaintiffs from determining the true amounts of wages owed to them; and caused Plaintiffs and will cause them extra work and effort to determine their true wages and the identity of their employer(s).

190.    Defendants are liable for statutory penalties, injunctive and declaratory relief, costs and attorneys' fees pursuant to New York Labor Law § 198.

191.    Plaintiffs request relief as described below and as permitted by law.

## COUNT V

### Improper Deductions from Wages (Chargebacks)

(N.Y. Lab. Law § 193)

*By Plaintiffs Robert Mullings, Kerwyn Kirton, Daneil Majeski, Kevin Kerr, Jeff Whitlock,*

*Malik Abdussabr, Kevin Maple, Eric Smith, Norman Whitt, and Nathan Kirby individually*

*against Plaintiff's previously identified Defendant(s)*

1.      Plaintiffs re-allege the allegations set forth above.

2.      Under N.Y. Lab. Law § 193, employers are not allowed to make unauthorized Deductions from the wages of an employee

3.      As alleged herein, Defendants regularly deducted "chargebacks" from Plaintiffs' pay in violation of 12 N.Y.C.R.R. § 142-2.10(a) ("Wages shall be subject to no deductions, except for allowances authorized in this Part").

4.      Plaintiffs suffered damages when Defendants violated their obligations under N.Y. Lab. Law 193, by making improper and unauthorized deductions from Plaintiffs' wages.

5.      Plaintiffs are entitled to recover underpayments for the six years preceding the first filing of their claims against Defendants, N.Y. Lab. Law § 198,[27] plus an additional amount as liquidated damages equal to one hundred percent of the total of such wages found to be due, interest, attorney's fees, and costs pursuant to N.Y. Lab. Law § 663, in amounts to be proved.

6.      Plaintiffs request relief as described below and as permitted by law.

**WHEREFORE**, Plaintiffs demand a trial by jury for all issues so triable, and request the Court enter judgment for Plaintiffs individually and:

---

[27] For Plaintiffs Robert Mullings, Kerwyn Kirton, and Daniel Majeski, *i.e.*, November 1, 2013; for Plaintiff Kevin Kerr, *i.e.*, December 23, 2013; and for Plaintiffs Jeff Whitlock, Malik Abdussabr, Kevin Maple, Eric Smith, Norman Whitt, and Nathan Kirby, *i.e.*, March 12, 2015.

THIRD AMENDED CONSOLIDATED COMPLAINT

a.      Award damages for unpaid minimum wages and unpaid overtime wages under 29 U.S.C. § 216(b) and New York Labor Law;

b.   Impose penalties as provided in New York Labor Law § 198;

c.   Award liquidated damages under 29 U.S.C. § 216(b) and New York Labor Law § 663;

d.   Award injunctive and declaratory relief under New York Labor Law § 198;

e.   Award reasonable attorneys' fees under New York Labor Law and Fair Labor Standards Act;

f.   Award pre-judgment interest;

g.   Award costs of suit under 29 U.S.C. § 216(b) and New York law; and

h.   Grant any further relief that the Court may deem just and equitable.

Dated:  May 27, 2015

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By: /s/ George A. Hanson
George A. Hanson, *Admitted Pro Hac Vice*
MO Bar No. 43450
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     816-714-7100
Facsimile:     816-714-7101
Email: hanson@stuevesiegel.com

Ryan D. O'Dell, *Admitted Pro Hac Vice*
CA Bar No. 192514
500 West C Street, Suite 1750
San Diego, California 92101
Telephone:     619-400-5822
Facsimile:     619-400-5832
Email: odell@stuevesiegel.com

THIRD AMENDED CONSOLIDATED COMPLAINT

Darren T. Kaplan, SDNY Bar # DK8190
Stueve Siegel Hanson LLP
1359 Broadway, Suite 2001
New York, NY 10018
Telephone:  212.999.7370
Facsimile:  816.714.7101
E-mail:  kaplan@stueveisegel.com

**HEARIN, LLC**
JESSE B. HEARIN, III
La. Bar Roll No. 22422
1009 Carnation Street, Suite E
Slidell, Louisiana 70460
Telephone:     985-639-3377
Email: jbhearin@hearinllc.com

*Attorneys for Plaintiffs*

THIRD AMENDED CONSOLIDATED COMPLAINT

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 27, 2015, a true and correct copy of Plaintiffs' Modified Second Amended Complaint was served on all counsel of record by the Court's electronic filing system (CM/ECF). The document is available for viewing and downloading from the Court's ECF system.

/s/ George A. Hanson
George A. Hanson
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
E-Mail: hanson@stuevesiegel.com